Filed 10/28/13  P. v. Rosas and Juarez CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALEX ROSAS and<br>FREDDY JUAREZ,<br><br>Defendants and Appellants. | B241364<br><br>(Los Angeles County<br>Super. Ct. No. BA379767) |

APPEALS from judgments of the Superior Court of Los Angeles County.  William C. Ryan, Judge.  Reversed as to Rosas; affirmed and remanded with directions as to Juarez.

Barbara S. Perry, under appointment by the Court of Appeal, for Defendant and Appellant Rosas.

Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant Juarez.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, and Carl N. Henry, Deputy Attorney General, for Plaintiff and Respondent.

Defendants Alex Rosas and Freddy Juarez appeal from the judgments entered following a jury trial in which they were convicted of second degree murder and attempted murder, with gang and firearm findings. Rosas contends the trial court erred by admitting two insufficiently redacted recorded statements by Juarez to his friend in jail and exacerbated the prejudicial effect of that error by giving testifying accomplice instructions, although Juarez did not testify. Juarez contends insufficient evidence supports his convictions and his firearm enhancement and sentence are unconstitutional. We agree that the trial court's admission of Juarez's recorded statements to his friend violated Rosas's confrontation rights and requires reversal of his convictions. We reject Juarez's challenges to his convictions, but agree that the trial court failed to comply with applicable constitutional authorities in sentencing Juarez to the functional equivalent of a life sentence, and accordingly we vacate Juarez's sentence and remand for resentencing.

## BACKGROUND

Around midnight on February 20, 2009, Miguel Martinez parked his car on Union Pacific Avenue between Indiana Street and Hicks Avenue in East Los Angeles. (Undesignated date references pertain to 2009.) Martinez testified that the two passengers in his car, Joe Lopez and Guadalupe Ramirez, got out of the car and began walking toward Indiana Street. Martinez was putting away his car stereo deck and remained in the car. He and Lopez were members of a tagging crew called the Insane Tagging Crew, or ITC for short. Ramirez was a member of the Gage Maravilla gang. Martinez testified they were going to a party near Olympic Boulevard and Indiana Street, about one block away. He denied they intended to tag, break into cars, or write graffiti in the area.

Martinez heard people running past his car, looked up, and saw two men running in the street, one of whom was holding a gun. He did not see where they had come from. Martinez honked his car's horn to alert Lopez and Ramirez, who began running toward Indiana Street. The gunman turned and pointed the gun toward Martinez, who ducked down in his car. The gunman began firing toward Lopez and Ramirez. Martinez started

2

his car and, while still ducked down, began driving toward his companions. His car went up onto the sidewalk and crashed into a light pole, dislodging his front bumper. He restarted the car and continued driving. He picked up Lopez and Ramirez at the corner of Union Pacific and Indiana. Martinez took Lopez to a nearby hospital, where he died from a gunshot wound to his upper back.

Martinez testified that he gave the police a general description of the two assailants: the shooter was about 17, thin, about 5 feet 6 inches or 5 feet 7 inches tall, had a "fade" haircut, and had brown skin with pimples; the other man was shorter by about an inch and was Hispanic. Martinez never identified anyone in this case.

Sheriff's department personnel collected eight .40-caliber cartridge casings between the east and west curbs of the north side of the intersection of Union Pacific and Hicks. Some of the casings were damaged, as if they had been run over. All had been ejected by the same gun, a .40-caliber Glock. A bullet was also recovered from the wall of a building at the northwest corner of Union Pacific and Hicks. It had also been fired from a .40-caliber Glock. The gun was not recovered. Martinez's bumper, complete with a license plate, was recovered next to a power pole at the southwest corner of Union Pacific and Hicks. Using the license plate, Detective Michael Valento located Martinez, who was the only eyewitness to testify. A recording from a surveillance camera at a store east of Hicks on Union Pacific depicted two people in dark clothing running west on Union Pacific, followed by Martinez's car driving, hitting the power pole, then driving west down the sidewalk.

On February 23 Valento noticed graffiti on a four-unit apartment building at 3963 Union Pacific, which was near the northeast corner of the intersection of Hicks and Union Pacific. The graffiti included "IDKS," which referred to the Indiana Dukes gang; "X3," which denoted Hispanic gangs south of Merced; "YSTER," which Valento and prosecution gang expert Los Angeles Police Department (LAPD) Officer Jose Vasquez testified meant "Youngster"; "B.S"; "I.T.C."; and graffiti signifying the King Kobras and Eighth Street gangs. No evidence established how long any of the graffiti had been there.

Vasquez opined that at the time of the charged offenses, both Juarez and Rosas were members of the Indiana Dukes gang. Rosas used Youngster, Risky, and Rascal as his monikers, while Juarez's moniker was Monkey. The location of the charged crimes was on the eastern border of the territory claimed by the Indiana Dukes gang. The King Kobras, Eighth Street, and Maravilla gangs were enemies of the Indiana Dukes gang, but Vasquez knew of a member of the Eighth Street gang who lived in the apartments at 3963 Union Pacific.

Valento initially had no suspects in the charged crimes, but began to suspect Juarez and Gerardo Morales after they were arrested for an unrelated robbery in August. Valento interviewed Juarez and Morales separately on August 30. A recording of Juarez's interview was played at trial. Valento told Juarez he had been identified as the shooter in the crimes charged in the present case. Juarez denied involvement and explained he lived in San Bernardino with his mother. Although he came to Los Angeles on weekends to visit his father and girlfriend, he usually arrived between 1:00 and 3:00 a.m. on Sunday. He further denied that he hung out at 3963 Union Pacific in February, saying it would have been too dangerous because that was territory claimed by the King Kobras gang. But he explained he might have been identified because he previously hung out in that area, and everyone in the area knew him.

As a ruse, Valento had created a photographic array in which Valento himself had circled Juarez's photograph and signed the array. Valento showed Juarez the ruse array, covering the signature, and told Juarez that he had been identified with 100 percent certainty. Juarez reiterated that he used to hang out in the area and added that when he was younger he had engaged in "stupid shit" in that area, including crossing out King Kobras graffiti, writing Indiana Dukes graffiti, asking people their gang affiliation, and even committing an aggravated assault there. Valento also told Juarez that witnesses said Morales was Juarez's accomplice in the charged offenses. Juarez said he had just met Morales the day they committed a robbery together. Juarez told Valento he used only small caliber guns and claimed he had not shot anyone since October 24, 2008. Juarez

4

ultimately said he had heard about the shooting in July from a friend named Jessie who was a member of ITC and had contacted Juarez through MySpace. Jessie told Juarez his "homey got killed" at Union Pacific and Hicks and asked if that was Juarez's "hood." After Juarez said it was the territory of the King Kobras gang, Jessie said his group knew the perpetrator was someone from King Kobras. But Juarez opined to Valento that the crime was more likely committed by a rival tagging crew because gangs recruit taggers or beat them up, but do not kill them. As another ruse, Valento took a saliva swab from Juarez after telling him that DNA had been collected at the crime scene.

After he finished interviewing Juarez and Morales, Valento placed them together in a jail cell that had a concealed recorder. A redacted version of the recording of their conversation was played at trial and the jurors were given transcripts of the recording in which blank lines indicated the redactions. Most of their wide-ranging conversation did not pertain to the charged offenses. With respect to the charged crimes, Juarez asked if Morales had corroborated his statement to Valento that they had met just before the robbery. Morales replied that he told Valento they knew each other in middle school, but that they had not seen each other for four or five years. Juarez asked Morales if Valento took a sample of his DNA, and Morales said he had not. Morales said, "[T]hey have you as a murder, dog, but people are saying that—that I'm the one that was with you." Juarez responded, "You know who it was?" Morales asked, "Who, who was what?" Juarez said, "That fool," followed by unintelligible whispering. Morales then said, "Oh, yeah, yeah. Oh." Inaudible whispering followed. Juarez then told him, "You already know—you—you know who." Morales asked, "When they were stealing the cars?" Juarez replied, "Ya," which was followed by "extended unintelligible whispering," after which Juarez said, "I seen those fools from Tiempo. They was from Tiempo, Ave, Avenues." Morales said, "Oh, did they say it was you?" Juarez replied, "No, I was, I was around there." More unintelligible whispering ensued, then Juarez said, "the fools that we was talking about."

5

After Morales and Juarez spoke further about their robbery charges, they returned to the subject of the murder, telling one another about their interviews with Valento. Morales then asked Juarez, "What did you shoot? What you'd shoot? Revolver?" After whispering by Morales, Juarez replied, "I don't know." After whispering by Juarez, Morales asked, "Glock?" and whispered something. Juarez said, "No," then whispered something. Morales asked, "Where's the shells? Do you have the" followed by whispering. Juarez then said, "No, I did, I didn't, I didn't sho, I didn't do shit. I didn't have the piece." This is followed by eight blank, double-spaced lines, after which Juarez said, "That DNA shit (unintelligible) don't, don't come out, I'm good. But, it does" followed by whispering. A little later, Juarez referred to Valento showing him "a line-up" in which he had been identified and recounted to Morales what he had told Valento. After this, Juarez said, "He thought he was gonna break me down." Juarez explained to Morales, "If you, you know at Union Pacific that's all taggers, mother fuckers that goin' back there to tag." Morales agreed. Juarez then said, "But that fool was over there stealing cars. So I don't know. That fool was trying to hit me. I'm like, what the fuck. 'Oh, so you don't look surprised.'" After Morales remarked that Valento did not take a sample of his DNA, Juarez responded, "You don't got to worry about shit." Morales said he had "better not," then laughed. Juarez continued, "But me . . . (unintelligible). How is it . . . ." Fourteen blank, double-spaced lines ensued.

After discussing other people and other crimes, Juarez returned to the topics of the murder, DNA, and his alibi of being in San Bernardino, then said, "But you know, my, but my mom, sometimes she's stupid. I gotta, . . . to call her." Juarez referred to "Jessie" "from I.T.C.," then said he (Juarez) had denied an accusation that he did "it," then said, "I think it was one of them fools snitching on me." This was followed by whispering. Juarez then recounted telling Valento that everyone in that neighborhood knew him and that he was in San Bernardino at the time of the murder. A little later, Juarez returned to the topic of DNA, saying, "But the thing, how, how could they get the DNA from me? By, by hair?" Morales explained it could come from "[a]ny little thing . . . that's outta

your body." Juarez began to respond, "Are you serio? When that shit happened . . . ." Morales suggested it might have come from sweat. Juarez said, "I, I wasn't sweating." Morales asked if Juarez left a glove or shirt at the scene. Juarez said, "I didn't," followed by something unintelligible. He said, "[I]magine a lil' hair dropped." Morales then asked, "Showered, everything, no? The piss works fool, but it doesn't really work that good." Valento testified that gang members commonly believe that urinating on their hands will eliminate gunshot residue. Juarez replied, "I know. But it had been like, fuck. Dang. I always thought this shit was done." He continued, "You—you don't get no murder, 'cause when they saying they point me out, 100 percent." A little later, Juarez said, "Some fool from ITC drop a dime, one of them, I don't know who, but . . . ." He also said, "If this DNA comes back positive . . . ." This was followed by 12 blank, double-spaced lines.

After that redaction, Morales spoke of how surprised he was when the detective accused him of being "'with [Juarez] for a murder.'" Juarez said, "I was trippin' out too . . . (unintelligible) . . . what the fuck he got to do with it." Juarez then said, "So, what I'm thinking about, what kind of DNA they got. Like, I think, what I'm thinking about is, I didn't drop no clothes. Cuz when that shit happened, all I was, I, when the other car, I was, I went like this, I went walking, then when that fool started, boom, boom, boom, boom, that's when I hit the corner and I started running . . . cheeww . . . I didn't touch nothing. I just ran. But I didn't touch nothing, though. They don't got fingerprints. Cuz if they had fingerprints . . . (unintelligible) . . . it is. I'm already, I'm already in the system . . . (unintelligible) . . . I just hope to God, I know I didn't do that shit, so, I just hope to God that shit don't come back. Never thought of coming back. (Unintelligible) . . . I'm all, 'Watch me.'" A little later, Juarez said he had been "hitting people . . . (unintelligible) . . . I can't even go to sleep, cuz, . . . (unintelligible) . . . you know I'm like, I smoked this fool and I'd be like, 'Fuck.' I try to go to sleep and I start thinking about it, like, fuck that, I'm not gonna get locked up for that shit." He then said that his "homie" Minor had tried to kill a rival gang member "right there on Olympic, so now they

got it—the shell and then now they got all the shells from all the other, other crimes and all of them come back to the same gun. They don't got the gun, but all the Sheriffs want to go talk to Minor in the county. . . . But that gun, in the ghetto, that shit's gone. I had to get rid of that shit, bro. I mean . . . (unintelligible) . . . . Hopefully this DNA comes back and it's negative, I'm . . . (unintelligible) . . . . Then have my mom say I was in San Bernardino with her. I'm done." This was followed by 23 blank, double-spaced lines.

Following the redaction, Juarez and Morales resumed talking about their interviews with Valento. Juarez then said, "It's been six months since this shit happened. February, fuck . . . (unintelligible)." Juarez whispered the rest of this statement. Morales said, "And I heard about that fool. That fool from ITC stealing cars and somebody lit em up. They told me it was some fool . . . (unintelligible) . . . forgot who told me." Juarez responded in an audible whisper: "Cuz the Tiempos came out . . . (unintelligible) . . . that was when we jumped up in, 'What the fuck, stop it, . . . (unintelligible) . . . Tiempo.' Pow, pow, pow, pow. It was that day, I don't know, I think this fool, cuz when they said it was a big gun. 'You like big ones?' I'm like, 'Nah, I like small ones, 38's 22's.' (Unintelligible) . . . let this fool have it. Then when this fool hit this fool, I didn't even know those fools. I don't know, dog. I didn't do it. I don't have to worry about it." This was followed by 23 blank, double-spaced lines. After that redaction, Juarez said, "I didn't think they will put you out in this one. How the fuck they . . . (unintelligible) . . . picture, mother fucker. I thought he would, they would pull out the homie, Youngster. I'm like fuck, cuz he's here right now, too. He's awaiting, he's awaiting to get deported." Morales said that the police would probably bring Youngster in after them, and Juarez responded, "Nah, they told me, the guy said that you were there." After an additional redaction and further conversation, Juarez said, "We're done talking, can we leave?" Morales laughed and said, "We're probably gonna . . . (unintelligible) . . . stay quiet for like an hour, dog."

Valento testified that after he heard Juarez say he thought they would show Youngster's photo, he began investigating the identity of "Youngster." He ultimately

found a photograph of Rosas and determined that Rosas had been in the county jail on August 30, when Juarez and Morales had their recorded conversation.

After Juarez and Morales were convicted of robbery and sent to prison, Valento had them returned to the county jail and reinterviewed each of them on January 29, 2010. Valento told Juarez that his DNA placed him at the crime scene but established he was not the shooter. He showed Juarez a fake DNA report to this effect. The report included a reference to Rosas. Valento testified that Juarez's hands trembled when he read the report. Valento showed Juarez a photograph of Rosas and said the DNA evidence had implicated Rosas as the shooter. Valento also told Juarez that he did not know where Rosas was. Valento told Morales that he had been exonerated by the DNA evidence, then showed Morales a photograph of Rosas and said the DNA evidence had implicated Rosas. Valento then put Juarez and Morales together on a bench with a recording device hidden nearby. A redacted version of the recording of their conversation was played at trial and the jurors were given transcripts of the recording in which blank lines indicated the redactions.

Juarez and Morales immediately began talking about their interviews with Valento. Morales said, "They have your DNA." Juarez acknowledged, "They do." Morales referred to a detective showing him a photo and asking, "'Is that fool Youngster?'" A few lines later, Juarez said, "They didn't have, like they came—they—they can't find Youngster." Juarez and Morales then discussed whether Youngster had fled, with Juarez's statements inaudible. Morales said, "Yeah, hey, that fool said, 'It's cool, he looks like you. Everybody's tryin' to say that he looks like you.'" Juarez replied, "Oh, they fucked up right there." Juarez continued, "Fucked up because they said it was you first, so whenever they send me to a case, I'm gonna call you. If they say, I'm gonna call you for a witness . . . . So the witness that pointed me and you out fucked up, 'cause he thought it was you. And that fool don't look shit like you, man. Short as fuck." Morales said, "And I'm buff." Juarez replied, "Yeah, I'm skinny," then laughed.

9

A little later, Juarez said, "They throw the picture of Youngster in my lap. But, you know, I don't even look at it because they tell me to, 'Look at it, look at it. Who's this?'" Juarez continued, "'That's your homeboy, Youngster.' 'I don't know this cat.' 'Well they call him what, Youngster?' 'Yeah, you guys are from the same neighborhood.' 'Nah, I never met him.' . . . I said right to them, 'I don't know that fool.' 'Look at him.' I don't got shit to look at him mother fucker. (INAUDIBLE) You think I talk about Youngster. Ya, he'll get a case. Have to, he will get a case." Morales asked, "Think so?" Juarez replied, "Who, Youngster? When he comes—he comes back, he always gots fake names. That's why they can't find him. He, he not in the U.S. He, he not, fuckin' every time he gets busted, he gives 'em different names. So he (INAUDIBLE). Yeah, my boy (INAUDIBLE). . . . 'Well we got twelve years to get this case on you. We gonna find Youngster. Oh, you know where's he's at?' 'I told you guys I don't know.' I told them, I don't know where he's at. But I got to get at his mom, homes. Vandal's gonna have to get at his mom."

Juarez resumed recounting his interview with Valento, then again said the police "fucked up" by accusing Morales and asked, "[H]ow the fuck they gonna confuse you with a fuckin' chaparro, skinny mother fucker, you know?" Morales agreed, and Juarez continued: "And he's tatted and you don't got no tats, so—" Morales confirmed that he had shown the detectives he had no tattoos. Juarez said he was "tryin' to get the fuck outta here." This was followed by 30 blank, double-spaced lines in the transcript. After a few additional lines of conversation, followed by another lengthy redaction, Juarez said he was not going to think about "this case," then added, "I know Youngster ain't gonna break. If I'm ever here when he come, he ain't gonna break. He ain't, and I know his priors dog, he not gonna break. I just have to talk to his mom and tell them, 'Hey, he has to relocate.'" This was followed by another redaction of 38 blank, double-spaced lines. Later, after Morales referred to law enforcement efforts to "get [Juarez] to do life," Juarez said, "I just need Youngster not to come back over here." Morales asked if Juarez thought he could make contact with Rosas, and Juarez said, "I—I can get a hold of his

mom, but I need to tell [inaudible] to come visit me. So I can just tell him in paper, what's up. That fool, Youngster, looked like a straight tweaker in that picture. I looked at him." After Morales said he saw "little tats right here" in the photo, Juarez confirmed, "Got tats." After Morales suggested Rosas would not want to "stay away for 12 years," Juarez said, "He not, he not gonna break. He's not gonna say shit. But when it comes down to, we go to trial, if we lose, [inaudible] what's up my boy?" A little later, Juarez said the detective tried to get him to take a deal, "[l]ike snitch on Youngster and tell them where he's at and tell and say that it was him that did it."

Valento testified that after the second Juarez-Morales conversation, he located Rosas in a federal institution in Virginia and went with Detective Todd Anderson to interview Rosas on February 2, 2010. That interview was recorded and the recording was played at trial. Rosas told Valento his moniker was Risky, but later said he had previously been known as Youngster. Rosas said he had been deported around the time of the Christmas holidays of 2008, and did not return to the United States until September of 2009, but was caught in the desert after he crossed the border. He was serving a 17- or 18-month sentence for illegal reentry. Valento noted that Rosas had been arrested by the LAPD in January of 2009 and was deported at that time. Rosas corrected himself and agreed that it was January 1 of 2009 that he was arrested and deported. Asked where this arrest occurred, Rosas said, "Olympic and Indiana." After Valento noted Rosas had "some arrests before September of '09," Rosas said, "No. I came back and I—I got arrested for a robbery." Rosas added that arrest was in August, the case was dismissed, and he was deported. Valento remarked that Rosas was arrested for "some dope" on April 29, 2009, and asked when Rosas returned between January and April of 2009. Rosas replied, "Well, I came back in April. The same month I got popped." Rosas explained he was deported in the wake of that case, also. Valento asked Rosas why he had said he did not return until September of 2009 after being deported at the beginning of 2009. Rosas said he had forgotten about the interim events.

11

Valento asked Rosas if he knew "Monkey" (Juarez). Rosas said he knew him but did not hang out with him. Rosas had last seen him about two years earlier when Monkey got out of the Youth Authority. Rosas also denied hanging out near the intersection of Union Pacific and Hicks, but acknowledged he was familiar with that location because he previously had a girlfriend who lived near there for a time. The detectives informed Rosas that there had been a late night shooting at Union Pacific and Hicks, specifically 3963 Union Pacific, in February of 2009, noting it was the same address where Rosas was arrested in January 2009. They further told him that DNA tests had implicated him and Monkey in the crime, and that when confronted with that information, Monkey had admitted his involvement but told them that Rosas was the shooter. Rosas repeatedly denied knowledge of the incident, knowing what ITC was, and hanging out on Union Pacific. Rosas repeatedly told the detectives he was not there, knew nothing about it, did not know how his DNA could be there, and had nothing to say to them He called their bluff with regard to both the DNA and the purported statements by Juarez, asking them why they were questioning him if they already had such strong evidence.

On March 28, 2010, Juarez phoned Rosas's mother, Dora Avila, from jail. The call was recorded and the recording was played at trial. Juarez identified himself as both "Freddy" and "Monkey" and asked Avila if she remembered him. She said she did. Juarez asked if Avila knew where Rosas was, and she told him Rosas was in Virginia. Juarez asked if any police had come to her house, and she said they had not. Juarez reminded Avila that he and Rosas "were always together." Juarez told Avila that he had been sentenced to 12 years and "they came to talk to me about some things" and "put your son's name." Juarez said, "[I]f you speak with him and he gets out, tell him to leave from here, because . . . see they're looking for me . . . I am here fighting a case." Juarez continued, "They have his name (unintelligible) on my paper so I want you to tell your son if he gets out to go far away from here because they are looking for him." Avila said she would do so. Valento testified it was "typical" for gang members to warn one another when police are looking for them.

12

On January 5, 2011, Valento returned to Virginia and brought Rosas back to Los Angeles. The next day, Valento told Rosas and Juarez that each would be placed in separate live lineups to be viewed by a witness. This was yet another ruse designed to record a conversation between Rosas and Juarez. Rosas and Juarez were placed together in the lineup staging area while jail deputies sought out other inmates who looked like Rosas and Juarez to participate in the sham lineups. The recording of the conversation between Rosas and Juarez and the lineups was played at trial.

After answering questions by deputies about their height, weight, and tattoos, Rosas said, "Hey, these fools be trying to spin, spin us up." Juarez replied, in Spanish, "Don't say anything." Rosas said, "Hey them fools were trying to tell me that you flipped on me. They told you the same shit, huh?" Juarez replied, "Same thing, homie." Rosas said he knew Juarez "didn't say shit." Juarez referred to "the DNA papers" and Rosas asked, "What, what DNA they got?" Juarez said, "It's bullshit." Juarez said they showed him "an FBI paper" and a photo of Rosas, but insisted he had denied knowing Rosas. Rosas and Juarez discussed what the detectives had said to them and what they had said to the detectives. Rosas said he had intended to wait until he saw "paperwork" regarding Juarez. Juarez responded, "You know I'd tell you," and "I know you wouldn't mess me up, dawg." Rosas said, "[T]hese fool[]s trying to involve us in something we didn't even do, homie . . . ." Juarez replied, "I know. I was in San Bernardino, I have my alibis." Juarez began to tell Rosas what "Silent" and "Simon" had said, and Rosas asked, in Spanish, "There's someone talking?" Juarez said he did not know, then said he had run "into couple fools from the area," whom he described as "lil taggers," in the three months he had been in the jail. Juarez told Rosas that he had been arrested with Solo (Morales) and the detectives "pulled him and me out and they told Solo, 'Hey you're the one— you're the shooter,' this and that, but Solo was like, 'Hell no.' Then . . . they told Solo, 'Hey, we're sorry, we confused you with somebody else.' . . . [T]hey thought he was you. For that one. They were coming every week to see me, dawg." After discussion about some of their mutual friends, Rosas mentioned some "little differences" he and

13

Juarez had had "out there" and some "shit that happened out there on that meeting," and said, "[Y]ou fools let me down" "[b]ut I ain't got . . . no grudge." Juarez said it was a "dead issue" and again denied having implicated Rosas.

A little later, Rosas asked, "Hey, you think they got any other witnesses?" Juarez replied, "No way." Juarez then stated, in a mixture of Spanish and English, "That fool got there fool. That fucken tagger fool, I know him from middle school that's his boy. That fool gots rest in peace, that fool. He was there with me. I told him, 'What's up dawg, what's crackin?' For that shit, how I got burned, because they were putting in MySpace, they were all, 'Yeah, Monkey, this, killed this fool, this fool, this fool, this fool.' So, hudas (cops) got all that shit on MySpace, so, it was me, and I told that fool, 'What's going on? What happened that day, who, who was there? Because, I was in San Bernardino, nobody from my neighborhood was out there, everybody got locked up, everybody, nobody was there.'" Juarez said he suggested it was "BSO [or] King Cobras." Rosas responded, "Probably was." Juarez said, "Yeah, it was. And then that fool was like, 'Oh, that day in that car, it was some fool from Maravilla, some fool from ITC,' so I got—I got them fools' numbers." Rosas asked, "Yeah, you think it's them?" Juarez replied, "Yeah." Rosas asked, in Spanish, "But they're not going to say anything, right?" Juarez said, "These fools said it happened like at twelve at night." Rosas responded, in Spanish, "Oh really?" Rosas and Juarez agreed it was dark on Union Pacific. Rosas said the detectives did not have any DNA, and Juarez said they had nothing. Juarez stated that the people in "that shop on the corner" "stay up all night" and "it's them fools." Juarez added he had "been getting visitors" and was trying to get particular people to visit "so I can get the shit and do something about it."

Rosas asked, "Hey, what do you think—if they—if they point us out, what do you think?" Juarez said the lineup did not matter, they would get attorneys and keep on going to court. He said, "[W]e need this fool pointing us out to go to court" "and get on the stand." Rosas said, "I know," and said he would "work on that" if it were "them fools." Later, Rosas said, "Hey, you know—you know who I thought it was? Claudio." Juarez

agreed.  Rosas and Juarez then conversed in Spanish.  Rosas said he was thinking of putting his "girl" "on alert" and telling "her to go to Claudio."  He then asked, "There's no one huh, fool?"  Juarez said, "Nobody was (Unintelligible)."  Rosas replied, "There wasn't huh fool?"  Juarez said, "Nothing."  Rosas asked, "Then why do you think they're going to bring someone now?"  Juarez said, partially in Spanish and partially in English, "I don't know, fool.  These fools they really want this case."  They agreed the detectives had no evidence, and Rosas said, "It's all right, we'll be all right, though."

Juarez spoke of hearing from another "homeboy" that people were saying he had "dropped a dime," then denied he had done so.  Rosas said Grumpy had asked him, "'You don't think Monkey's saying something?'  I was like, 'Saying what?' you know what I'm saying.  There's nothing to say, you know what I'm saying."  He continued, "'There's nothing to say because I, I was never with Monkey,' you know what I'm saying."  Juarez said, "Dude, I got an alibi, I was just in San Bernardino . . . ."  Rosas said, "I was in Mexico, and this fool's trying . . . ."

At that time, deputies began grouping the participants for the lineup containing Rosas.  When they let Rosas return to Juarez, Juarez said he asked his mother "to call her," and Rosas replied, "She told me one time you called, like, telling me to be careful."  Rosas said, "Hey, you know who I hope it is?  Claudio."  He continued in Spanish:  "He's not going to say anything, fool.  Neither is his girl."  Juarez agreed, "Yeah, that's the only people, that's the only people."  Rosas agreed, "Yeah, that's the only people I can think of."  Rosas then said, "[B]ut why is she going to say some fucked up shit that I didn't even do, you know, that we didn't even do, so."  He continued, "[S]he didn't see me do shit because I didn't do shit."  After Juarez mentioned another one of their friends who was in jail, Rosas said, "Man, when we were all out there, we had that 'hood terrorized."  They continued to discuss their fellow gang members, the activities of those gang members, and their own tattoos and those of other gang members until the deputies began conducting the lineups.

When the lineup containing Rosas was conducted, Valento instructed the deputy to have Rosas, and no one else, step to the center of the stage and say "fuck tiempos." He testified that he made this request because Juarez had told Morales that phrase was uttered just before the charged shootings. The deputy complied. Rosas asked, "What? She say?" The deputy repeated the request and Rosas said, "I don't understand." The deputy again repeated the request and Rosas said, "What?" After the deputy reiterated the request, Rosas said, "The dimples?" The deputy again repeated, "Fuck tiempos," and Rosas said it. The participants exited the stage, and Rosas rejoined Juarez. Rosas said, "What was that?" Juarez said he did not know. Rosas asked, "Hey, why do you think they made me step—" Juarez said he did not know. Rosas asked, "You think they pointed me out?" Juarez said, "Fuck tiempos." Rosas asked, "What is that?" Juarez said, "Who the fuck would've said fuck tiempos? I don't know." Rosas said, "It don't make no sense." He later asked, "Who was that crew supposedly, what's the name of it?" Juarez replied, "ITC, Insane Tagging Crew, Insane something. Fuck tiempos, she was trying to say fuck tiempos, time." He continued, "Tiempos, that's fucking crazy. We got to get on that." Rosas said, "Hopefully they didn't point us out. What do you think?" Juarez said, "We need him or her" "in the stand." Rosas replied, "Chhh, what if they go . . . and lie about shit?" Juarez noted that the lineup witness had not identified him, whereas the detectives had told him that the witness had previously identified him with certainty. Juarez said, "I don't think it was a cool line-up." Rosas replied, "I don't know. Who cares, I mean, we didn't do nothing. That was weird though, that fuck whatever." "Tiempos," Juarez reminded him. Rosas said, "I said dimples because I didn't understand what she was saying. Did you understand it?" Juarez said, "No."

One of the lineup deputies told Rosas he had been identified and explained, "[T]hat's why they called you back up there." A little later, Rosas wondered, "How am I gonna find out who it is?" Juarez assured Rosas that if he hired private counsel, the attorney would tell him. Juarez also said, "They said that shit happened, like, at 12, 1, 2 in the morning." Rosas responded, "Yeah?" Juarez continued, "It was dark as fuck. You

16

know, Union Pacific it be dark, so that fool had to be close to each other." Rosas asked, "Who?" Juarez continued, "Or they, or they already had showed the picture of you, the detectives were like, 'Oh, look, are those the two guys?' 'Oh yeah.' So, you come in—" Rosas completed the thought: "And they already know." Juarez said, "You, you came from Mexico in April, that's the only time, April. I was in San Bernardino. You got your alibis, I got my alibis, that's all we need."

Juarez said, "Silent told me something about it, but I, I cut him off, I'm like, 'I don't want to hear that shit.'" He continued, "I'm, 'Nah, I don't care, I was in San Bernardino.'" Rosas asked, "What do you think he's saying? 'I seen him there,' or 'I seen him running,' or something? What can he be saying, 'I seen him shooting'?" Juarez responded, "We got action, this shit happened a long time ago dawg. That's what they say." He added, "[T]hey're saying this shit happened a long time ago, like '08."

The prosecution also played several other recordings of Juarez asking various friends to contact potential witnesses. During a January 15, 2011 visit, Juarez asked a visitor to contact Grumpy to dissuade a "fool" from Maravilla from coming to court because there was "a gang of fools snitching." Juarez also asked the visitor to take a couple of friends and visit "Jesse" (spelled "Jessie" in other transcripts), who knew the "fools" who were in the car. Juarez said to tell "them fools to not show up to court" "[b]ecause that's the only way I'm a get off."

In a phone call later in the day on January 15, 2011, Juarez asked "Lil Man" to talk to Jesse, who had gone to school with them, because Juarez had told Jesse "a shit load of things and Jesse knew too much." Juarez said, "So, that fool knows everything, I talked to him when he was here, so if he acts stupid, fool, know get em, alright?" Lil Man agreed to do so.

On January 23, 2011, Juarez phoned Grumpy and gave him a phone number for Jesse, said Jesse knew everything that had happened and knew the taggers, and he would take Grumpy to them. Grumpy said he would talk to Jesse.

The date of Rosas's return to the United States was a contested issue. Officer Mark Bravo testified he arrested Rosas after Rosas drove into the driveway at 3963 Union Pacific on January 1, 2009. The parties stipulated that Rosas was arrested that day and physically returned to Tijuana on January 6. Bravo cited Rosas for a traffic violation at Indiana and Union Pacific on March 31. Rosas had also received a traffic citation on March 10 in Vernon.

To attempt to prove that Rosas returned before March, the prosecution called Crystal Marquez as a witness. She testified that on January 16, 2009, she and her cousins were in the front yard of her mother's home on Hicks Avenue following funeral services for Marquez's sister and the sister's young child when a dark-colored car drove up and stopped. Rosas, the passenger in the car, got part way out of the car and asked why there was a crowd at the house. Marquez did not recognize the driver, who did not get out of the car. Marquez testified she considered Rosas's statements and conduct disrespectful and became irate. She told her cousins she did not want "gangbanging" at her sister's funeral reception, and her cousins spoke to Rosas and his companion, who then left. Marquez testified she had previously seen Rosas "patrolling" the area and heard that "Youngster" used "'to terrorize that block.'" She testified Rosas once asked her where she was from, and she was offended by this because she did not look like a gang girl. Marquez admitted she had been drinking alcohol before the car containing Rosas arrived. She further admitted that she had been convicted of selling methamphetamine in 2004, felony check forgery in 2003, and misdemeanor check forgery in 2002. She also used methamphetamine, including after her sister's death in January of 2009, but not on the day of the funeral. Marquez was further impeached with her prior inconsistent statements to Valento, in which she said the car was white, two people—including someone named Marco—got out of it, and she personally told the men to leave. At trial, Marquez denied knowing anyone named Marco.

Rosas's mother, Dora Avila, testified as a defense witness that Rosas could not possibly have been in Los Angeles on January 16, 2009, the day Marquez claimed to see

18

him, because Avila was sending him money in Tijuana and he was phoning her collect from Mexico. He called her six or eight times in January of 2009, including January 16, 17, 19, and 20. She electronically sent him money on January 7, 9, 12, 18, and 23, and documents admitted at trial reflected this. After January 23, she had to send him cash through friends because Rosas lost his identification card and was unable to claim money sent electronically.

Photographs of the tattoos of Juarez and Rosas taken in January of 2011 were admitted at trial, and gang expert Vasquez testified that they signified membership in the Indiana Dukes gang. Vasquez had first met Rosas in 2000, when Rosas had fewer tattoos. Vasquez further testified that he had previously testified at a 2006 trial in which Rosas was convicted of possessing a loaded, unregistered gun.

Vasquez opined that newer members of a gang are required to "put in work" for the gang, including committing crimes, while older, more experienced members accompanied them to verify the "work" performed. He further opined that a member of the Maravilla gang who entered Indiana Dukes territory was likely to encounter retaliation. Similarly, members of a tagging crew who wrote graffiti in Indiana Dukes territory were likely to encounter retaliation. In response to a hypothetical question based upon the prosecution's evidence, Vasquez opined that the charged crimes were committed for the benefit of, at the direction of, or in association with the Indiana Dukes street gang with the specific intent to further its criminal conduct.

Rosas was 22 at the time of the charged crimes and at the time of the sham lineup he was 5 feet 5 inches tall and weighed 165 pounds. Juarez was 17 at the time of the charged crimes. At the time of the sham lineup he was 5 feet 7 inches or 5 feet 8 inches tall and weighed 150 pounds.

Rosas and Juarez were tried together by a single jury. The jury convicted each defendant of second degree murder and attempted murder. With respect to both defendants, the jury found the attempted murder was not willful, deliberate, and premeditated, but that the offenses were committed for the benefit of, at the direction of,

19

or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members.  The jury further found that Rosas personally used a gun, fired a gun, and fired a gun, causing death.  (Pen. Code, § 12022.53, subds. (b), (c), (d); undesignated statutory references are to the Penal Code.) The jury found, with respect to Juarez, that a principal personally used a gun, fired a gun, and fired a gun, causing death.  (§ 12022.53, subds. (b), (c), (d), (e).)  The court sentenced Rosas to 77 years to life in prison, consisting of 15 years to life for the murder, plus 25 years to life of the section 12022.53, subdivision (d) enhancement, plus 7 years for attempted murder, plus 20 years for the section 12022.53, subdivision (c) enhancement, plus 10 years for the gang enhancement.  The court sentenced Juarez to 65 years to life in prison, consisting of 15 years to life for the murder, plus 25 years to life for the section 12022.53, subdivisions (d) and (e) enhancement, plus 5 years for attempted murder, plus 20 years for the section 12022.53, subdivisions (c) and (e) enhancement.

## DISCUSSION

**1.      Admission of Juarez's statements to Morales violated Rosas's confrontation rights**

In *Bruton v. United States* (1968) 391 U.S. 123 [88 S.Ct. 1620] (*Bruton*), the United States Supreme Court concluded that introduction in a joint trial of a nontestifying defendant's extrajudicial statement that implicates a codefendant violates the codefendant's federal constitutional right of confrontation, even if the jury is instructed to consider the statement only with respect to the defendant who made it.  (*Id.* at p. 137.) "The high court reasoned that although juries ordinarily can and will follow a judge's instructions to disregard inadmissible evidence, 'there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.' (*Id.* at p. 135.)  Such a context is presented when 'the powerfully incriminating extrajudicial statements of a codefendant, who stands accused

20

side-by-side with the defendant, are deliberately spread before the jury in a joint trial.' (*Id.* at pp. 135–136.)" (*People v. Lewis* (2008) 43 Cal.4th 415, 453.)

Before trial, Rosas moved to exclude or redact Juarez's statements during his conversations with Morales, sever his trial from that of Juarez, or empanel two juries. The trial court denied severance, dual juries, and exclusion, redacted two statements from the first conversation between Juarez and Morales, and ruled nothing else in either redacted statement violated *Bruton*. Before the conversations were admitted at trial, Rosas renewed his objections, which the trial court overruled.

Rosas contends that the redacted Juarez-Morales conversations nonetheless included statements by Juarez that implicated Rosas in the charged crimes and thus violated his federal constitutional rights to confront and cross-examine witnesses against him. We agree.

"[T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." (*Richardson v. Marsh* (1987) 481 U.S. 200, 211 [107 S.Ct. 1702] (*Richardson*).) "[E]diting a nontestifying codefendant's extrajudicial statement to substitute pronouns or similar neutral terms for the defendant's name will not invariably be sufficient to avoid violation of the defendant's Sixth Amendment confrontation rights." (*People v. Fletcher* (1996) 13 Cal.4th 451, 468.) "Redactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration, however, leave statements that, considered as a class, so closely resemble *Bruton*'s unredacted statements that . . . the law must require the same result." (*Gray v. Maryland* (1998) 523 U.S. 185, 192 [118 S.Ct. 1151] (*Gray*).) "When, despite redaction, the statement obviously refers directly to the defendant, and involves inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial, the *Bruton* rule applies and introduction

of the statement at a joint trial violates the defendant's rights under the confrontation clause." (*People v. Burney* (2009) 47 Cal.4th 203, 231 (*Burney*).)

In *Richardson*, *supra*, 481 U.S. 200, the confession of defendant Williams, who was tried jointly with Marsh, was redacted to omit not only all references to Marsh, but every "indication that *anyone* other than . . . Williams" and Martin (who was not tried with Marsh and Williams) had "participated in the crime." (*Id*. at p. 203.) The trial court also instructed the jury not to consider that confession against Marsh. (*Id*. at p. 205.) The redacted confession stated that Williams and Martin had discussed the murder in the front seat of a car while they traveled to the victim's house, but did not indicate that anyone else was in the car. (*Id*. at pp. 203–204, fn. 1.) Although Marsh ultimately testified at trial that she was in the back seat of the car (*id*. at p. 204), the Supreme Court held that the redacted confession did not violate *Bruton* (*Richardson* at pp. 208, 211).

In *Gray*, *supra*, 523 U.S. 185, a confession by codefendant Bell was redacted by merely omitting the names of Gray and a deceased accomplice. When a detective read the confession at trial, he said, "'deleted'" or "'deletion'" in lieu of these names. After he finished reading the confession, he testified that based upon the information provided by Bell, he arrested Gray. The written copy of the confession substituted blank spaces, separated by commas, for their names. (*Id*. at pp. 188–189.) The Supreme Court held that the redacted confession ran afoul of *Bruton* because it "refer[red] directly to the 'existence' of the nonconfessing defendant," and the jury would have realized that it was the nonconfessing defendant's name that had been deleted. (*Id*. at pp. 192–193.) The court noted that "the prosecutor, after all, has been arguing that [the nonconfessing defendant], not someone else, helped [the confessing defendant] commit the crime." (*Id*. at p. 193.) The court further noted that "the obvious deletion may well call the jurors' attention specially to the removed name. By encouraging the jury to speculate about the reference, the redaction may overemphasize the importance of the confession's accusation—once the jurors work out the reference." (*Ibid.*) Statements redacted in this manner are as directly accusatory as unredacted statements and create "a special, and

vital, need for cross-examination." (*Id.* at p. 194.) "The blank space in an obviously redacted confession also points directly to the defendant, and it accuses the defendant in a manner similar to Evans' use of Bruton's name or to a testifying codefendant's accusatory finger. By way of contrast, the factual statement at issue in *Richardson*—a statement about what others said in the front seat of a car—differs from directly accusatory evidence in this respect, for it does not point directly to a defendant at all." (*Ibid.*)

The court in *Gray* conceded that "in some instances the person to whom the blank refers may not be clear," such as when the evidence "indicates that there are more participants than the confession has named." (*Gray*, *supra*, 523 U.S. at pp. 194–195.) The court also acknowledged that a jury had to use inference to connect the blanks in the redacted statement to the defendant, and that "*Richardson* placed outside the scope of *Bruton*'s rule those statements that incriminate inferentially." (*Gray* at p. 195.) But the court concluded that *Richardson*'s application depended "in significant part upon the *kind* of, not the simple *fact* of, inference." (*Gray* at p. 196.) When, notwithstanding redaction, the statement "obviously refer[s] directly to someone, often obviously the defendant, and . . . involve[s] inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial," the introduction of the statement at a joint trial violates the non-confessing defendant's confrontation rights. (*Id.* at pp. 196–197.)

Considering the redacted Juarez-Morales conversations as a whole, they repeatedly revealed, expressly or implicitly, that Juarez had an accomplice in the commission of the charged crimes, and Rosas was that accomplice. Because Rosas was charged with the same crimes and the prosecutor contended that Rosas was that accomplice, the jury would have realized that the accomplice to whom Juarez referred was Rosas. For example, in the first conversation, Morales said, "[P]eople are saying that—that I'm the one that was with you," and said he had told the detective he was not. Juarez said, "You know who it was?" Morales asked, "Who, who was what?" Juarez replied, "That fool . . . (unintelligible whispering)." Morales replied, "Oh, yeah, yeah. Oh." This clearly

revealed the *existence* of an accomplice and the jury would have ultimately realized that it was Rosas's name that Juarez had whispered unintelligibly. The trial court should have eliminated all of the quoted statements.

Next, after Morales asked a number of questions about what kind of gun Juarez used and where "the shells" were, Juarez said, "No, I did, I didn't, I didn't sho, I didn't do shit. I didn't have the piece." This is followed by eight blank, double-spaced lines. This clearly revealed that Juarez was asserting that he had an accomplice, and his accomplice was the shooter. The jury would have realized that the accomplice to whom Juarez referred was Rosas, and the blank lines "also point[ed] directly to" Rosas and accused him. (*Gray*, *supra*, 523 U.S. at p. 194.) We further note that because so much of the unredacted conversation was irrelevant to the charged offenses, the jury would not infer that redacted portions were merely irrelevant.

After Juarez questioned how he could have left DNA at the scene of the charged crimes, he said, "Cuz when that shit happened, all I was, I, when the other car, I was, I went like this, I went walking, then when that fool started, boom, boom, boom, boom, that's when I hit the corner and I started running . . . cheeww . . . I didn't touch nothing. I just ran." Although this statement is susceptible of other interpretations, in the context of Juarez's prior statement that he did not "have the piece" and the prosecutor's theory that Rosas was the gunman, an obvious inference from this statement is "that fool" referred to Juarez's accomplice, and "boom, boom, boom, boom" referred to shooting. Indeed, Juarez argued this interpretation in his closing argument. Thus, this statement was yet another assertion by Juarez that his accomplice was the shooter. The jury would have realized that the accomplice to whom Juarez referred was Rosas.

For the same reasons, the following statements by Juarez should have been eliminated (ellipses in original): "Cuz the Tiempos came out . . . (unintelligible) . . . that was when we jumped up in, 'What the fuck, stop it, . . . (unintelligible) . . . Tiempo.' Pow, pow, pow, pow. It was that day, I don't know, I think this fool, cuz when they said it was a big gun. 'You like big ones?' I'm like, 'Nah, I like small ones, 38's 22's.'

24

(Unintelligible) . . . let this fool have it. Then when this fool hit this fool, I didn't even know those fools. I don't know, dog. I didn't do it. I don't have to worry about it." This was yet another assertion by Juarez that his accomplice was the shooter, and the jury would have realized that the accomplice to whom Juarez referred was Rosas.

More than one page of blank space followed the statement quoted in the preceding paragraph. Juarez then said, "I didn't think they will put you out in this one. How the fuck they . . . (unintelligible) . . . picture, mother fucker. I thought he would, they would pull out the homie, Youngster. I'm like fuck, cuz he's here right now, too. He's awaiting, he's awaiting to get deported." Morales said that the police would probably bring Youngster in after them, and Juarez, responded, "Nah, they told me, the guy said that you were there." (Ellipses in original.) A short time before Juarez made this statement, he had spoken about the detective showing him the photographic array with the photograph of himself "circled hundred percent." In this context, the statements, "I thought he would, they would pull out the homie, Youngster" and "the guy said that you were there" expressed Juarez's surprise that the detective had not produced a photograph of Rosas showing that he had also been identified as a perpetrator of the charged offenses and that the detective had asserted that Morales was Juarez's accomplice. Thus, these statements asserted that Rosas committed the charged offenses with Juarez.

In the second conversation between Juarez and Morales, Morales said the detective had shown him a photo and asked, "'Is that fool Youngster?'" A few lines later, Juarez said, "They didn't have, like they came—they—they can't find Youngster." Juarez and Morales then discussed whether Youngster had fled, with Juarez making several inaudible statements. Morales said, "Yeah, hey, that fool said, 'It's cool, he looks like you. Everybody's tryin' to say that he looks like you.'" Juarez replied, "Oh, they fucked up right there." Juarez then expanded on this, saying, "So the witness that pointed me and you out fucked up, 'cause he thought it was you. And that fool don't look shit like you, man. Short as fuck." This constituted an assertion by Juarez that Rosas was his accomplice in the charged crimes.

25

After additional references to "Youngster," Juarez said, "They throw the picture of Youngster in my lap. But, you know, I don't even look at it because they tell me to, 'Look at it, look at it. Who's this?'" Juarez continued, "'That's your homeboy, Youngster.' 'I don't know this cat.' 'Well they call him what, Youngster?' 'Yeah, you guys are from the same neighborhood.' 'Nah, I never met him.' . . . I said right to them, 'I don't know that fool.' 'Look at him.' I don't got shit to look at him mother fucker. (Inaudible.) You think I talk about Youngster. Ya, he'll get a case. Have to, he will get a case." Morales asked, "Think so?" Juarez replied, "Who, Youngster? When he comes—he comes back, he always gots fake names. That's why they can't find him. He, he not in the U.S. He, he not, fuckin' every time he gets busted, he gives 'em different names. So he (inaudible). Yeah, my boy (inaudible). . . . 'Well we got twelve years to get this case on you. We gonna find Youngster. Oh, you know where's he's at?' 'I told you guys I don't know.' I told them, I don't know where he's at. But I got to get at his mom, homes. Vandal's gonna have to get at his mom." Although much of what Juarez said purported to recount his interview with the detective, the statements, "You think I talk about Youngster. Ya, he'll get a case. Have to, he will get a case" and "But I got to get at his mom, homes. Vandal's gonna have to get at his mom" clearly implied that Rosas was Juarez's accomplice in the charged offenses because if Juarez had talked about Rosas to the detectives, Rosas would "get a case," and it was important to warn Rosas's mother to help Rosas avoid getting arrested.

After Juarez continued to speak about his interview with the detectives, he said the police "fucked up" by accusing Morales and asked, "[H]ow the fuck they gonna confuse you with a fuckin' chaparro, skinny mother fucker, you know." Juarez continued, "And he's tatted and you don't got no tats, so—" After two additional brief statements each by Morales and Juarez, there were 30 blank, double-spaced lines. Juarez's statements about the absurdity of the police confusing Morales with someone else clearly referred to the appearance of his accomplice. The record reveals that Rosas had numerous tattoos, including some on his face, he weighed 165 pounds at the sham lineup, and he was 5 feet

26

5 inches tall. The jury could infer that Juarez's description of his accomplice was consistent with Rosas. Thus, in context, Juarez's statement in this segment effectively pointed at Rosas as Juarez's accomplice in the charged crimes.

A few lines of conversation followed the lengthy blank space described in the preceding paragraph, then 33 blank, double-spaced lines ensued. After that, Juarez said he was not going to think about "this case," then added, "I know Youngster ain't gonna break. If I'm ever here when he come, he ain't gonna break. He ain't, and I know his priors dog, he not gonna break. I just have to talk to his mom and tell them, 'Hey, he has to relocate.'" This expressly referred to Rosas and implicitly referred to his guilt, through reference to him not confessing and needing to flee.

A little later, after four short segments of conversation interspersed with three segments of blank lines, Morales referred to law enforcement efforts to "get [Juarez] to do life." Juarez responded, "I just need Youngster not to come back over here." Morales asked if Juarez thought he could make contact with Rosas, and Juarez said, "I—I can get a hold of his mom, but I need to tell (inaudible) to come visit me. So I can just tell him in paper, what's up. That fool, Youngster, looked like a straight tweaker in that picture. I looked at him." After Morales said he saw "little tats right here" in the photo to which Juarez had referred, Juarez confirmed, "Got tats." After Morales suggested that Rosas would not want to "stay away for 12 years," Juarez said, "He not, he not gonna break. He's not gonna say shit. But when it comes down to, we go to trial, if we lose, (inaudible) what's up my boy?" A little later, Juarez said the detective tried to get him to take a deal, "[l]ike snitch on Youngster and tell them where he's at and tell and say that it was him that did it." This segment expressly referred to Rosas and his complicity in the charged offenses (the possibility Juarez could "snitch" on Rosas) and implicitly refers to his guilt, through reference to him not confessing and the need to keep Rosas from "com[ing] back over here."

In addition, it is significant that Rosas admitted in his interview with detectives that Youngster was a moniker he had used, Officer Bravo testified that Rosas used the

27

name Youngster and Bravo did not know of anyone else from the Indiana Dukes who used that moniker, and the prosecutor conditioned the jury in his opening statement to understand that Rosas was "Youngster" and he "was the shooter in this murder and attempted murder." And, just as in *Gray*, *supra*, 523 U.S. 185, Valento testified that Juarez's reference to Youngster in his first recorded conversation with Morales caused Valento to obtain a photograph of Rosas and to confirm that Rosas had been in county jail in August of 2009, when the first Juarez-Morales conversation occurred. After hearing the second Juarez-Morales conversation, Valento searched for Rosas and traveled to Virginia to interview him on February 2, 2010.

Accordingly, notwithstanding the redactions the prosecutor and the court made to the Juarez-Morales conversations, there can be no doubt that the jury understood the above-quoted segments of those conversations to both refer to and implicate Rosas as Juarez's accomplice and the shooter in the charged crimes. This created a dire need for Rosas to be able to cross-examine Juarez, which, of course, he could not. Introduction of these conversations thus violated Rosas's confrontation rights.

The Attorney General argues, as did the prosecutor in the trial court, that the coconspirator and declaration against interest exceptions to *Bruton*'s rule of exclusion apply. We disagree.

The coconspirator exception applies to statements made by coconspirators while participating in a conspiracy and in furtherance of the objective of that conspiracy. (*People v. Roberts* (1992) 2 Cal.4th 271, 303–304.) Assuming, for the sake of argument, that Juarez and Rosas conspired to kill Lopez and attempt to kill Ramirez, Juarez's statements to Morales 6 and 11 months after the charged crimes were not made during the course of the conspiracy, but long after the conspiracy had achieved its objective. Nor were these statements—made to someone who was not part of the conspiracy—in furtherance of the objective of that conspiracy. Juarez was not seeking Morales's assistance to complete the objective of the conspiracy, for example. He was instead

28

merely telling Morales about the prior crime. Accordingly, the coconspirator exception was inapplicable.

The declaration against interest "exception" to *Bruton* "allows admission only of those portions of the statement that are 'specifically disserving' to the declarant's interest." (*People v. Smith* (2005) 135 Cal.App.4th 914, 922.) The trial court must excise any portion of a statement that is not specifically disserving to the declarant, especially statements that incriminate or shift blame to another. (*People v. Duarte* (2000) 24 Cal.4th 603, 617–618.) A statement in which a declarant implicates both himself and his codefendant falls squarely within *Gray*, *supra*, 523 U.S. 185, and its admission at a joint trial violates the codefendant's confrontation rights. The statements we have addressed in this section implicated Rosas and had to be either sufficiently redacted or excluded, even though some of them also constituted admissions by Juarez. Admission of these statements against Rosas violated his confrontation rights.

*Bruton* error is not reversible per se, but is instead "scrutinized under the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]." (*Burney*, *supra*, 47 Cal.4th at p. 232.) "In determining whether improperly admitted evidence so prejudiced a defendant that reversal of the judgment of conviction is required, we have observed that 'if the properly admitted evidence is overwhelming and the incriminating extrajudicial statement is merely cumulative of other direct evidence, the error will be deemed harmless.'" (*Ibid.*)

Apart from the Juarez-Morales conversations, the evidence against Rosas consisted solely of consciousness of guilt inferences arising from (1) Rosas's false statements to the detectives during the interview in Virginia about when he returned to the United States after being deported to Mexico in January of 2009 and about not hanging out at 3963 Union Pacific, and (2) Rosas's statements to Juarez before and after the sham lineups reflecting Rosas's concern regarding whether there were witnesses, whether the people Juarez had said accused Juarez on MySpace were "going to say anything," whether someone had identified either or both of them during the sham lineups, the identity of the

29

witness brought in to view the lineups, and whether that witness was Claudio.  With respect to the first category, it is far from certain that Rosas's consciousness of guilt pertained to the charged crimes.  According to the prosecution, Rosas was an active member of a criminal street gang who "patrolled" that area and hung out at 3963 Union Pacific, Rosas had possessed drugs for sale at that location and been arrested there multiple times.  Thus, Rosas may have committed illegal acts at or near 3963 Union Pacific during 2009 other than the charged crimes.  With respect to the second category, although Rosas's statements certainly created a suspicion that he was involved, they are equally consistent with Rosas having some knowledge of the charged crimes and being concerned about misidentification as a perpetrator.  Other statements he made during his conversation with Juarez tended to show he was not involved in the charged offenses.  His references to Claudio were not necessarily incriminating because Valento and Anderson had told Rosas that they were investigating a murder at "Union Pacific and Hicks" and "3963 Union Pacific," which is apparently where Claudio lived.  We further note that while Juarez and the prosecutor accused Rosas of being the gunman, the sole testifying eyewitness testified that the gunman was taller than his accomplice and appeared to be 5 feet 6 inches or 5 feet 7 inches tall, about 17 years old, and thin.  This description fit Juarez, who was 17 at the time of the offenses, 5 feet 7 inches or 5 feet 8 inches tall, and weighed 150 pounds.  Rosas, in contrast, was 22 years old at the time of the offenses, weighed 165 pounds at the sham lineup, and he was 5 feet 5 inches tall.

Thus, the properly admitted evidence was far from overwhelming, and we necessarily conclude that the improper admission of Juarez's statements was not harmless beyond a reasonable doubt and we must reverse Rosas's convictions.

Rosas argues he may not be retried because the properly admitted evidence was insufficient to support a conviction.  The Attorney General does not address this point.  In assessing this issue, we must consider the evidence as a whole, not just the properly admitted evidence.  (*Lockhart v. Nelson* (1988) 488 U.S. 33, 40–41 [109 S.Ct. 285].)  Considering Juarez's accusatory statements along with the remaining evidence, the

evidence was sufficient to support the verdicts against Rosas. Accordingly, double jeopardy does not preclude a retrial.

Given our disposition, we need not fully address Rosas's contention regarding the trial court's instructional errors regarding Juarez's statements to Morales. We merely note that, in addition to its obligation to properly redact the Juarez-Morales conversations to avoid violating Rosas's confrontation rights, the trial court was required to instruct the jury to consider those statements only against Juarez, and not against Rosas. The trial court failed to do so, and instead gave instructions pertaining to the *testimony* of an accomplice that effectively told the jury it *could* consider Juarez's statements as evidence against Rosas. These instructional errors necessarily exacerbated the prejudice flowing from the admission of the improperly redacted statements.

## 2. Sufficiency of evidence regarding Juarez

Juarez contends that the evidence was insufficient to support his conviction because Rosas was the shooter, meaning Juarez was an aider and abettor or coconspirator, and nothing the record shows his knowledge of Rosas's intent, his intent to aid and abet Rosas, or any words or conduct by him that aided and abetted Rosas. Juarez implicitly relies upon his own statement to Morales accusing Rosas of being the actual shooter, and he expressly relies upon the following statement he made to Morales: "Cuz when that shit happened, all I was, I, when the other car, I was, I went like this, I went walking, then when that fool started, boom, boom, boom, boom, that's when I hit the corner and I started running."

To resolve this issue, we review the whole record in the light most favorable to the judgment to decide whether substantial evidence supports the conviction, so that a reasonable jury could find guilt beyond a reasonable doubt. (*People v. Tully* (2012) 54 Cal.4th 952, 1006.) Substantial evidence is """"evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."""" (*Ibid.*) We presume the existence of every fact supporting the judgment that the jury could reasonably deduce from the evidence and make all

31

reasonable inferences that support the judgment.  (*People v. Barnes* (1986) 42 Cal.3d 284, 303; *People v. Catlin* (2001) 26 Cal.4th 81, 139.)  The theories argued by the prosecutor are not the exclusive theories that may be considered by the jury.  (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.)  Direct evidence of knowledge and intent is rare; generally these matters must be established by circumstantial evidence and reasonable inferences therefrom.  (*People v. Buckley* (1986) 183 Cal.App.3d 489, 494–495.)

One who knows another's unlawful purpose and intentionally aids, promotes, encourages, or instigates the crime is guilty as an aider and abettor of both the offense he or she intended to facilitate or encourage (the target crime) and any other crime committed by the person he or she aids and abets that is the natural and probable consequence of the target crime.  (*People v. Prettyman* (1996) 14 Cal.4th 248, 259, 261.)  An aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed, and need not have the specific intent otherwise required for the offense committed.  (*Id.* at p. 261.)

The jury may consider facts such as presence at the scene of the crime, and companionship and conduct before and after the offense, including flight, in deciding whether a defendant knew of the perpetrator's intentions and intended to facilitate or encourage the crime.  (*People v. Mitchell* (1986) 183 Cal.App.3d 325, 330.)

The trial court instructed the jury on aiding and abetting and the natural and probable consequences doctrine, specifying assault with a firearm as the target offense.  The court further instructed on conspiracy principles.

Viewing the record in the light most favorable to the judgment against Juarez, we conclude substantial evidence supports his convictions.  A multitude of statements by Juarez establish that he accompanied the perpetrator when the charged crimes were committed.  For example, in his first recorded conversation with Morales, after Morales said, "[T]hey have you as a murder, dog, but people are saying that—that I'm the one that was with you."  Juarez responded, "You know who it was?" Morales asked, "Who, who was what?"  Juarez replied, "That fool," followed by unintelligible whispering.  Morales

asked, "When they were stealing the cars?" Juarez replied, "Ya," which was followed by "extended unintelligible whispering, after which Juarez said, "I seen those fools from Tiempo." "Tiempo" was apparently a nickname for ITC, as Juarez used it several times in his conversation with Morales. There was some speculation that Martinez, who was on probation for auto theft at the time of trial, and his companions may have been in the area to break into cars. A little later Juarez referred to taggers going to Union Pacific to tag, then said, "But that fool was over there stealing cars. So I don't know. That fool was trying to hit me. I'm like, what the fuck." A little later Juarez referred to ITC: "Some fool from ITC drop a dime, one of them, I don't know who, but . . . ." Later, after Juarez said he got rid of a gun that had been used in a number of crimes, he said, "Hopefully this DNA comes back and it's negative, I'm . . . (unintelligible) . . . . Then have my mom say I was in San Bernardino with her. I'm done." Soon thereafter, Morales said, "And I heard about that fool. That fool from ITC stealing cars and somebody lit em up. They told me it was some fool . . . (unintelligible) . . . forgot who told me." Juarez responded in an audible whisper: "Cuz the Tiempos came out . . . (unintelligible) . . . *that was when we jumped up in* [italics added], 'What the fuck, stop it, . . . (unintelligible) . . . Tiempo.' Pow, pow, pow, pow."

Although at the time of the first recorded Juarez-Morales conversation Valento had said only that DNA was found at the crime scene, not that it was Juarez's DNA, Juarez repeatedly expressed concern about the results of the DNA comparison. He also wondered how DNA could have been found at the scene, asking, "But the thing, how, how could they get the DNA from *me*? [Italics added.] By, by hair?" Juarez began to say, "When that shit happened . . . ." Morales suggested it might have come from sweat. Juarez said, "I, I wasn't sweating." Morales asked if Juarez left a glove or shirt at the scene. Juarez said, "I didn't." A little later, Juarez returned to the question of how his DNA could be at the scene and referred to how fingerprints could have incriminated him: "So, what I'm thinking about, what kind of DNA they got. Like, I think, what I'm thinking about is, I didn't drop no clothes. Cuz when that shit happened, all I was, I,

33

when the other car, I was, I went like this, I went walking, then when that fool started, boom, boom, boom, boom, that's when I hit the corner and I started running . . . cheeww . . . I didn't touch nothing. I just ran. But I didn't touch nothing, though. They don't got fingerprints. Cuz if they had fingerprints . . . (unintelligible) . . . it is. I'm already, I'm already in the system . . . (unintelligible) . . . I just hope to God, I know I didn't do that shit, so, I just hope to God that shit don't come back."

In the second recorded Juarez-Morales conversation, after Valento had falsely told Juarez that DNA testing had revealed that Juarez was there, but Rosas was the shooter, Morales said, "They have your DNA." Juarez acknowledged, "They do." Throughout this conversation, he expressed a hope that Rosas would not be caught and his confidence that, if Rosas were caught, he would not confess. Juarez said, "I know Youngster ain't gonna break. If I'm ever here when he come, he ain't gonna break. He ain't, and I know his priors dog, he not gonna break. I just have to talk to his mom and tell them, 'Hey, he has to relocate.'" A little later Juarez said, "I just need Youngster not to come back over here." After Morales suggested Rosas would not want to "stay away for 12 years," Juarez said, "He not, he not gonna break. He's not gonna say shit." Thus, Juarez's statements to Morales clearly established that he accompanied the perpetrator when the charged crimes were committed and supported inferences of his consciousness of guilt.

In addition, a strong inference of consciousness of guilt could be drawn from Juarez's attempts to suppress evidence through his contacts with his friends in 2011, seeking to have his friends dissuade a "fool" from Maravilla from coming to court and visit Jesse in order to prevent Jesse or the taggers he knew from testifying against Juarez.

In addition, Martinez testified that just before the shooting, he heard, then saw, two men running past his car in the street in the same direction Lopez and Ramirez were walking. Juarez's statements to Morales and attempts to suppress evidence establish that he was one of the two men. The location of the casings and bullet strike, the gunshot wound to Lopez, and Martinez's testimony support a strong inference that Juarez and the other man whom Martinez saw running were pursuing Lopez and Ramirez. The jury

34

could infer that Juarez and his companion intended to confront and intimidate Lopez and Ramirez, probably for reasons related to gang rivalry or gang territorialism.  Juarez was a member of the Indiana Dukes gang, which had written graffiti at 3963 Union Pacific and tended to hang out near there; Lopez was a member of the ITC tagging crew, which had also written graffiti at 3963 Union Pacific; and Ramirez was a member of the Gage Maravilla gang, which was a rival to the Indiana Dukes gang.  Martinez saw that one of the men was carrying a gun, and the jury could infer that if Martinez could see that gun, the man's companion could also see the gun.  Thus, if Juarez was not the man who was carrying the gun, he at least knew that his companion carried a gun as they chased Lopez and Ramirez.  The jury could further infer from the presence of the gun and Juarez's conduct in running with the other man that both Juarez and his companion shared the intent to, at a minimum, aim the gun at Lopez and Ramirez.  (See *People v. Asher* (1969) 273 Cal.App.2d 876, 891 [jury could infer a planned conspiracy to rob a bar and its patrons from defendants' coordinated actions].)  This was sufficient to support a finding that Juarez, if he was not actually the gunman, knew of and shared his companion's intent to aim the gun at Lopez and Ramirez during a confrontation.  And Juarez's accompaniment of the gunman aided the planned armed confrontation because it evened the numbers of attackers and targets and thus strengthened the attack and its prospects for success.

Accordingly, Juarez's sufficiency of evidence claim has no merit.

**3.      Juarez:  constitutionality of section 12022.53, subdivision (e)**

Section 12022.53 provides for a 20-year enhancement, or 25 years if the victim suffers great bodily injury or dies, for anyone who personally and intentionally discharges a firearm in the commission or attempted commission of certain felonies, including murder.  (§ 12022.53, subds. (d), (e).)  Section 12022.53, subdivision (e) extends these enhancements to aiders and abettors if the offense is committed for the benefit of a criminal street gang.

Juarez contends that the imposition of these enhancements under section 12022.53, subdivision (e) punishes aiders and abettors of crimes committed for the benefit of street gangs more severely than aiders and abettors of crimes committed for the benefit of equally dangerous criminal associations, such as drug cartels and terrorist organizations, and thus violates equal protection.

To succeed on an equal protection claim, a defendant must first show that the state has adopted a classification that treats similarly situated persons in an unequal fashion. (*People v. Wilkinson* (2004) 33 Cal.4th 821, 836 (*Wilkinson*).)  If a defendant shows such disparate treatment, the legislation is reviewed differently based upon the nature of the classification.  Strict scrutiny applies where the legislation creates a suspect classification based upon race or national origin or infringes a fundamental interest.  (*Ibid.*)  An intermediate level of scrutiny applies to classifications based upon gender or illegitimacy.  (*Ibid.*)  At a minimum, a statutory classification must be rationally related to a legitimate governmental purpose.  (*Ibid.*)

Juarez argues that strict scrutiny is required here because a fundamental interest— his liberty—is implicated.  Criminal statutes that distinguish among offenders on the basis of the circumstances of the offense or the manner in which it was committed do not require strict scrutiny simply because the offender's right to liberty is at stake. (*Wilkinson*, *supra*, 33 Cal.4th at pp. 837–838.)  A defendant does not have a fundamental interest in the designation a crime receives or the term of imprisonment provided for a particular offense.  (*Id.* at p. 838.)  "Application of the strict scrutiny standard in this context would be incompatible with the broad discretion the Legislature traditionally has been understood to exercise in defining crimes and specifying punishment."  (*Ibid.*)

In *People v. Hernandez* (2005) 134 Cal.App.4th 474 (*Hernandez*), Division Seven of this district addressed the issue raised by Juarez and concluded that section 12022.53, subdivision (e) is rationally related to a legitimate state purpose.  The court stated, "It is beyond dispute the state has a legitimate interest in suppressing criminal street gangs.  [The defendant] concedes this.  He also acknowledges the state has a legitimate interest in

punishing criminal gun use more severely than the use of other weapons. . . . [¶] Courts have long recognized . . . a Legislature 'acting within its proper field, is not bound to extend its regulation to all cases which it might possibly reach.' It may direct its attention '"to those classes of cases where the need is deemed to be clearest."' In enacting the street gang legislation in 1988 the Legislature found, among other things, 'in Los Angeles County alone there were 328 gang-related murders in 1986, and that gang homicides in 1987 have increased 80 percent over 1986.' When the Legislature enacted section 12022.53 10 years later and made aiders and abettors of gang crimes involving gun use equally liable with the actual perpetrator it did so 'in recognition of the serious threats posed to the citizens of California by gang members using firearms.' As our Supreme Court has stated, the Legislature 'is not prohibited by the equal protection clause from striking the evil where it is felt the most.' [¶] . . . [¶] . . . Where as here the question is not whether to deprive [the defendant] of his liberty but for how long, we believe rational basis review, not strict scrutiny, is the appropriate test to resolve an equal protection challenge. [¶] Clearly the Legislature had a rational basis for imposing a 25-years-to-life enhancement on one who aids and abets a gang-related murder in which the perpetrator uses a gun. . . . As we previously observed, the purpose of this enhancement is to reduce through punishment and deterrence 'the serious threats posed to the citizens of California by gang members using firearms.' One way to accomplish this purpose is to punish equally with the perpetrator a person who, acting with knowledge of the perpetrator's criminal purpose, promotes, encourages or assists the perpetrator to commit the murder." (*Id.* at pp. 481–483, fns. omitted.)

We agree with the *Hernandez* court that a rational basis exists for the distinction drawn by the Legislature. Juarez argues *Hernandez* was wrongly decided, citing *People v. Olivas* (1976) 17 Cal.3d 236 as authority for a strict scrutiny analysis of the classification drawn by the statute. But, as the Supreme Court explained in *Wilkinson*, *supra*, 33 Cal.4th 821, "The language in *Olivas* could be interpreted to require application of the strict scrutiny standard whenever one challenges upon equal protection grounds a

37

penal statute or statutes that authorize different sentences for comparable crimes, because such statutes always implicate the right to 'personal liberty' of the affected individuals. Nevertheless, *Olivas* properly has not been read so broadly. . . . 'We do not read *Olivas* as requiring the courts to subject all criminal classifications to strict scrutiny requiring the showing of a compelling state interest therefor.' [Citation.] Other courts similarly have concluded that a broad reading of *Olivas,* as advocated by defendant here, would 'intrude[] too heavily on the police power and the Legislature's prerogative to set criminal justice policy.'" (33 Cal.4th at pp. 837–838.) Accordingly, *Hernandez* properly applied the rational basis test. We follow *Hernandez* and reject Juarez's equal protection claim.

**4.      Juarez:  constitutionality of indeterminate sentence**

Juarez, who was 17 when the charged crimes were committed, contends that his 65-years-to-life sentence is unconstitutional pursuant to *Miller v. Alabama* (2012) 567 U.S. __ [132 S.Ct. 2455] (*Miller*); *Graham v. Florida* (2010) 560 U.S. 48 [130 S.Ct. 2011] (*Graham*); and *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*). We conclude the trial court failed to consider the factors required by these decisions and remand for resentencing in light of these decisions.

In *Graham*, the United States Supreme Court considered the constitutionality of imposing a sentence of life without possibility of parole on a juvenile offender who committed an offense other than homicide. The court concluded that such a sentence constituted cruel and unusual punishment. (*Graham*, *supra*, 560 U.S. at p. __ [130 S.Ct. at p. 2030].) The court relied upon studies reflecting that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence." (*Id.* at p. __ [130 S.Ct. at p. 2026].) Because juveniles have a less developed moral sense than adults, the court viewed them as less morally culpable than adults who commit the same offenses. (*Id.* at p. __ [130 S.Ct. at p. 2027].) In addition, the court noted "[j]uveniles are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are

38

the actions of adults." (*Id.* at p. __ [130 S.Ct. at p. 2026].) "To justify life without parole on the assumption that the juvenile offender forever will be a danger to society requires the sentencer to make a judgment that the juvenile is incorrigible. The characteristics of juveniles make that judgment questionable. 'It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'" (*Id.* at p. __ [130 S.Ct. at p. 2029].)

In *Miller*, *supra*, 567 U.S. at page __ [132 S.Ct. at p. 2475], which was decided after Juarez's sentencing, the Supreme Court relied on *Graham*'s rationale in holding that *mandatory* life-without-possibility-of-parole sentences for juvenile offenders who commit homicide violate the Eighth Amendment's ban on cruel and unusual punishment. The court explained that such a sentence necessarily "precludes consideration of [the juvenile's] chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys." (*Id.* at p. __ [132 S.Ct. at p. 2468].) The court did not foreclose the possibility of a sentence of life without the possibility of parole in homicide cases for "'the rare juvenile offender whose crime reflects irreparable corruption,'" but the sentencing court is required to consider the potentially mitigating effect of the aforementioned factors. (*Id.* at p. __ [132 S.Ct. at pp. 2469, 2475].)

In *Caballero*, *supra*, 55 Cal.4th 262, also decided after Juarez's sentencing, the California Supreme Court considered whether a 110-year-to-life sentence imposed on a

juvenile convicted of nonhomicide offenses contravened *Graham*'s mandate against cruel and unusual punishment under the Eighth Amendment, and concluded that it does. (*Id.* at p. 265.) The court stated, "[W]e conclude that sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment. Although proper authorities may later determine that youths should remain incarcerated for their natural lives, the state may not deprive them at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future. Under *Graham*'s nonhomicide ruling, the sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board." (*Id.* at pp. 268–269.)

Collectively, *Miller*, *supra*, 567 U.S. __ [132 S.Ct. 2455], and *Caballero*, *supra*, 55 Cal.4th 262, require a sentencing court to consider the matters set forth in *Miller* and *Caballero* before sentencing a juvenile to either life without possibility of parole or an aggregate sentence that is the functional equivalent of a life sentence without possibility of parole. (*People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482.) Juarez was sentenced to 65 years to life, with actual custody credits of 495 days. He was 20 at the time of sentencing. Accordingly, he would be approximately 83.5 years old before becoming eligible for parole consideration. According to the most recent National Vital Statistics Reports available from the Centers for Disease Control and Prevention, the average life expectancy for Hispanic males is 78.39 years. (See <http://www.cdc.gov/nchs/data/nvsr/nvsr61/nvsr61_03.pdf> [as of Oct. 22, 2013].) Thus, Juarez's aggregate term is the functional equivalent of a life sentence without possibility of parole. The trial court in this case did not offer any reasons for its sentencing decisions regarding either defendant, let alone consider any of the matters set forth in *Miller* and *Caballero* with respect to

Juarez. As noted, *Miller* and *Caballero* were decided after Juarez's sentencing. Accordingly, we must vacate Juarez's sentence and remand for resentencing. The trial court is directed to exercise its discretion in accordance with the authorities cited and discussed in this section.

## DISPOSITION

The judgment against Rosas is reversed and the cause remanded for further proceedings in accordance with this opinion. Juarez's sentence is vacated and the cause is remanded for resentencing in accordance with *Miller v. Alabama* (2012) 567 U.S. __ [132 S.Ct. 2455] and *People v. Caballero* (2012) 55 Cal.4th 262. Upon resentencing Juarez, the trial court is directed to prepare an amended abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment against Juarez is affirmed.

NOT TO BE PUBLISHED.


MALLANO, P. J.

We concur:


ROTHSCHILD, J.


JOHNSON, J.